IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

VRC COMPANIES, LLC,
d/b/a VITAL RECORDS CONTROL,

    Plaintiff,

v.                                                  Case No. 2:22-cv-02461-MSN-tmp

CARLOS A. RODRIGUEZ and
MRME, LLC,

    Defendants.

---

### ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Before the Court is VRC Companies, LLC d/b/a Vital Records Control's ("Plaintiff") Motion for Preliminary Injunction ("Motion," ECF No. 35.), filed August 16, 2022. Defendants Carlos A. Rodriguez ("Defendant"[1]) and MRME, LLC ("MRME") submitted their respective brief in opposition (ECF No. 37) on August 22, 2022. The Court set a hearing on the matter on August 23, 2022. For the reasons below, Plaintiff's Motion is **GRANTED**.

### BACKGROUND

The following facts provide an overview of the evidence submitted to the Court. Findings of fact and conclusions of law in this Order are made for purposes of a preliminary injunction only

---

[1] There are two Defendants in this case: Defendant Rodriguez and MRME, a single member LLC wholly owned by Defendant Rodriguez. Because most of the actions at issue in this matter were taken by Defendant Rodriguez before he created Defendant MRME, the Court will refer only to Defendant Rodriguez as "Defendant" for purposes of this Order. The Court will reference MRME as "MRME."

and are not binding at a trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

A. **History of Relationship Between Plaintiff and Defendant**[2]

Plaintiff provides return of information ("ROI") services to healthcare providers nationwide. (ECF No. 32 at PageID 153.) Prior to joining Plaintiff, Defendant also engaged in ROI services, but through NEXT Medical Records, LLC ("NEXT Medical"), a business he formed in 2012. (ECF No. 16-1 at PageID 95.) In 2016, Defendant sold this business to VitalScan, LLC ("VitalScan"), an affiliate of Plaintiff.[3] (ECF No. 32 at PageID 154.) This sale kicked off a nearly six-year relationship between Plaintiff and Defendant that ultimately involved multiple agreements with one another. This matter primarily involves three of those agreements.

First, on December 30, 2016, VitalScan and Defendant entered into an Asset Purchase Agreement ("APA") for NEXT Medical. (*Id.*) Among other things, this agreement provided that NEXT Medical agreed to sell, and VitalScan agreed to buy, NEXT Medical's client goodwill. (*Id.*) The agreement also provided that VitalScan would enter into a 3-year employment agreement with Defendant, and that Defendant would execute a Non-Competition Agreement with VitalScan barring him from soliciting NEXT Medical's former customers. (*Id.*)

---

[2] This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. (ECF No. 32 at PageID 153.) VRC is a Delaware limited liability company with its principal place of business located in Tennessee. (*Id.* at PageID 152.) None of VRC's members are domiciled in or citizens of Texas. (*Id.*) Defendant Carlos Rodriguez is an adult resident and citizen of Texas. MRME, LLC ("MRME") is a Texas limited liability company with its sole member and principal place of business located in Texas. (*Id.* at PageID 153.)

[3] As stated in the Verified Amended Complaint and discussed in the preliminary injunction hearing, VitalScan was an affiliate of Plaintiff at the time VitalScan acquired NEXT Medical Records, LLC. Upon its merger with Plaintiff in 2018, VitalScan assigned its assets, including its employment agreement with Defendant, to Plaintiff. (ECF No. 41 at PageID 306.)

Second, and pursuant to the APA, Defendant became the Vice President of ROI Services at VitalScan and signed a Confidentiality and Non-Competition Agreement ("2017 Non-Compete") on February 1, 2017. (*Id.*) In summary, this agreement barred Defendant from competing with Plaintiff and soliciting Plaintiff's customers for five years after the termination of his employment with Plaintiff. (*Id.*)

In 2019, after about two years as Vice President of ROI Services at VitalScan, Defendant and Plaintiff mutually agreed that Defendant would no longer serve as an employee of Plaintiff, but would instead work as an independent contractor. (*Id.*) Despite this change, however, Defendant was still bound by the 2017 Non-Compete during his time as an independent contractor. (*Id.* at PageID 154–55.) The following year, Plaintiff rehired Defendant as an employee, this time as Vice President of [Health Information Management ("HIM")] Services. (*Id.* at PageID 155.)

Third, after a little over a year into his new role, Defendant signed a new non-competition agreement ("2021 Non-Compete") with Plaintiff on June 10, 2021. (*Id.*) This agreement superseded the 2017 Non-Compete and barred Defendant from soliciting clients of Plaintiff or otherwise competing with Plaintiff for a period of two years after departing the company. (*Id.* at PageID 155–56.) Notably, this agreement included the following sections:

> 6.0 **Non-competition and Non-Solicitation**. Employee acknowledges and agrees that by virtue of his or her employment with VRC, Employee will enjoy a position of special trust and confidence with VRC. Employee expressly acknowledges that the restrictions set forth in this Section 6.0 are reasonable and necessary to protect VRC's legitimate protectable interests which include, but are not limited to, its goodwill, relationships with its customers, and its Confidential Information and Trade Secrets, and that Employee has been provided with good and valuable consideration for his or her agreement to be bound by the terms herein. Employee further warrants and represents that in the event of Employee's termination for any reason, VRC's enforcement of this Section will not prevent the Employee from earning a livelihood.
>
> 6.1 **Non-Solicitation** During the period of Employee's employment with VRC and for period of two (2) years following the termination of Employee's employment, for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, on behalf of himself or herself, any entity, or others: (i) induce or encourage any employee of VRC to

>leave the employ of VRC, or in any way encourage or facilitate a VRC employee's departure, resignation, or termination of employment, (ii) hire, attempt to hire, solicit for employment, seek to retain on a consultant basis, any individual who is an employee or contractor of VRC, or (iii) Induce, solicitor [sic] encourage any actual or prospective customer, client, supplier, or other business relation of VRC with which Employee had contact with during his or her VRC employment, to cease or reduce doing business with VRC, or in any way interfere with the relationship between any such actual or prospective customer, client, supplier or other business relation and VRC.

(*Id.* at PageID 155–56.) The 2021 Non-Compete also contained a Tennessee choice of law and forum selection provision. (*Id.*)

Defendant would go on to become Area Vice President — HIM Services at Plaintiff in March 2022, in which he oversaw Plaintiff's relationships with clients on the West Coast. (*Id.* at PageID 157.) In April 2022, however, Defendant and Plaintiff finally parted ways. (*Id.*) Upon his departure, Defendant signed the 2022 Separation Agreement that reaffirmed the terms of the 2021 Non-Compete. (*Id.*)

**B.     Post-Employment Controversy**

According to Plaintiff's Amended Complaint, within a month or so of signing the 2022 Separation Agreement with Plaintiff, Defendant Rodriguez breached the 2021 Non-Compete in two main ways: (1) by competing with Plaintiff through his new company (MRME) and (2) by soliciting one of Plaintiff's clients—Infirmary Health—to do business with MRME. (*Id.*) Before the Court, Plaintiff's Chief Executive Officer testified that Infirmary Health's Clinical Director told him they were terminating their contract with Plaintiff because they felt a certain loyalty to Defendant and wanted to help his new business. (ECF No. 41 at PageID 322.) Plaintiff also alleges that Defendant is soliciting other customers of Plaintiff in violation of the 2021 Non-Compete. (ECF No. 32 at PageID 158.)

Defendant does not dispute that he is bound by the 2021 Non-Compete. (*See* ECF No. 16 at PageID 86.) He argues, however, that the 2021 Non-Compete only applies to his employment

4

as Area Vice President with Plaintiff, in which he primarily focused on clients on the West Coast. Consequently, he argues that the 2021 Non-Compete does not restrict him from contacting and soliciting the NEXT Medical clients he brought to Plaintiff—such as Infirmary Health—because those clients are located on the East Coast and under a different employee's supervision. (*Id.* at PageID 86–87.)

On July 18, 2022, Plaintiff filed a motion for a Temporary Restraining Order (ECF No. 8, "TRO"), which the Court granted on August 1, 2022. (*See* ECF No. 27.) That Order has remained in place until this Order.

## **LEGAL STANDARD**

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief to prevent immediate and irreparable injury by preserving the parties' respective positions until a trial on the merits can be held. *Camenisch*, 451 U.S. at 395. Whether to grant injunctive relief is a determination left to the discretion of the trial court. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). A preliminary injunction "[is] an 'extraordinary and drastic remedy.'" *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). As such, the court may only award one "upon a clear showing that the plaintiff is entitled to such relief." *Id.* (internal citations omitted).

In exercising its discretion to issue a preliminary injunction, the district court looks to four factors: "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "A district court must balance [these] four factors in determining whether to grant a

5

preliminary injunction." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020). The party seeking the preliminary injunction bears the burden of persuasion. *See Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).

## DISCUSSION

Plaintiff requests that the Court grant it preliminary injunctive relief. (ECF No. 35.) Specifically, Plaintiff asks that this Court enter a preliminary injunction to "enjoin Defendants Carlos A. Rodriguez and MRME, LLC from competing with [Plaintiff] and soliciting its customers during the pendency of this litigation or the entry of a permanent injunction and further enjoin both Defendants from interfering with its business relationships by soliciting customers of [Plaintiff] through MRME." (ECF No. 35 at PageID 169.)

**A.    Likelihood of Success on the Merits on Plaintiff's Breach of Contract Claim**

Although Plaintiff raises additional causes of action, at bottom this is a breach of contract case.[4] This matter arises under the Court's diversity jurisdiction and the agreements select Tennessee as the appropriate forum for this dispute. (ECF No. 32 at PageID 153.) Accordingly, the Court applies Tennessee law "to determine whether Plaintiff has met the first of these factors by demonstrating a substantial likelihood of success on the merits of his underlying diversity action." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541

---

[4] Plaintiff alleged in its First Verified Complaint the following claims against Defendant Rodriguez: (1) Breach of Contract (concerning the 2021 Non-Compete), (2) Breach of Contract (concerning the 2022 Separation Agreement), and (3) Intentional Interference with Business Relationships. (ECF No. 1 at PageID 6–11.) In its amended Complaint, Plaintiff added a claim of intentional interference with business relationships against MRME. (*See* ECF No. 32 at PageID 160.) As resolution of Plaintiff's claims of intentional interference with business relationships turns upon its breach of contract claims, the Court only addresses the breach of contract claims for purposes of this Order.

(6th Cir. 2007); *see also Smith & Nephew, Inc. v. N.W. Ortho Plus, Inc.*, No. 2-12-cv-02476-JPM-dkv, 2012 WL 6607289, at *15 (W.D. Tenn. Dec. 18, 2012).

To establish likelihood of success on the merits, the movant must demonstrate "more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason Cnty Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977)). It is typically sufficient, however, if the movant has "rais[ed] questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

The parties in this matter do not dispute that Defendant is bound by the 2021 Non-Compete, which was reaffirmed by the 2022 Separation Agreement. They disagree, however, on the extent to which the 2021 Non-Compete bars Defendant from soliciting NEXT Medical clients. Central to that dispute is the parties' differing views about whether the restrictive covenants in the 2021 Non-Compete are unreasonable, and so unenforceable against Defendant under Tennessee law.

1.  **Protectable Business Interest**

To ascertain whether a non-compete is reasonable, courts first address the threshold question of whether "the employer has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999). *See also Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (1984)); *Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 384 (Tenn. Ct. App. 2009). That interest must also be "actually protected by the [non-compete] agreement. There is no legitimate interest in protection from competition, only from unfair competition." *Girtman & Assoc., Inc. v. St. Amour,* No. M2005–00936–COA–R3–CV, 2007 WL 1241255, at *6 (Tenn. Ct. App. Apr.

7

27, 2007). The time and territorial limits of the non-compete must also not be greater than necessary. *Allright Auto Parks, Inc., v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).

Thus, in this matter, the Court must determine whether Plaintiff has a legitimate business interest that is protectable by the 2021 Non-Compete and that the agreement is not unreasonable in its scope. The Court recognizes that:

> [A]ny competition by a former employee may well injure the business of the employer. An employer, however, cannot by contract restrain ordinary competition. In order for an employer to be entitled to protection, there must be special facts present over and above ordinary competition. These special facts must be such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer.

*Hasty*, 671 S.W.2d 471 at 473 (internal citations omitted). Plaintiff must therefore show "special facts beyond protection from ordinary competition that would give *the employee* an unfair advantage in competing with the employer." *Columbus Med. Servs., LLC*, 308 S.W.3d at 384–85. Considerations for discovering whether the employee would have an unfair advantage include:

> (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. These considerations may operate individually or in tandem to give rise to a properly protectable business interest.

*Vantage Tech.*, 17 S.W.3d at 644 (citations omitted). *See also Columbus Med. Servs., LLC*, 308 S.W.3d at 385. In its Motion for Preliminary Injunction, Plaintiff primarily relied on the third consideration—customer relationships—to establish a protectable interest, arguing that Defendant's "continuous association with [Plaintiff] since the time of the sale of his business makes him the 'face' of [Plaintiff] such that these clients associate him with management of their health records." (ECF No. 35-1 at PageID 177.)

The Court finds that Plaintiff is likely to succeed in showing that Defendant would have an unfair advantage in competing with Plaintiff based on this consideration. As acknowledged by the Tennessee Court of Appeals:

> It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill . . . . [T]he employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit.

*Vantage Tech.*, 17 S.W.3d at 645–46. It is undisputed that Defendant's association with Plaintiff—whether as an employee or as an independent contractor—was continuous from the time he signed the APA in 2016 until he was terminated by Plaintiff in 2022. Testimony at the preliminary injunction hearing further showed that Defendant interacted with former NEXT Medical clients throughout his association with Plaintiff. Plaintiff's CEO testified that Defendant managed all of Plaintiff's ROI customers when he first started at Plaintiff as Vice President of ROI Services, including those clients who were formerly NEXT Medical clients. (ECF No. 41 at PageID 310–11.) Defendant begrudgingly acknowledged in his own testimony that this interaction continued during his role as Vice President of HIM Services, though he would prefer to classify these more recent contacts as "favors" for his superiors rather than actions required as part of his employment by Plaintiff. (*See* ECF No. 41 at PageID 404.)

Whether due to his duties as Vice President of ROI services, or to his later interactions with Plaintiff's clients as Vice President of HIM Services, the Court finds that Plaintiff is likely to succeed in showing Defendant's repeated contacts with former NEXT Medical clients on behalf of Plaintiff were such that clients would naturally associate him with the company providing its ROI services—namely, Plaintiff. Accordingly, the Court finds that Plaintiff has "more than a mere possibility of success on the merits" in establishing that Defendant would

9

have an unfair advantage in competing with Plaintiff, and thus that it has a legitimate business interest in its customer relationships sufficient to justify enforcement of the 2021 Non-Compete.

Defendant counters that because he established his relationships with the former NEXT Medical clients *before* coming to Plaintiff, Plaintiff cannot rely on this consideration to establish a protectable interest in its relationships with these clients.  (*See, e.g.*, ECF No. 37 at PageID 189–90.)  In support, Defendant cites two cases in which the Tennessee Court of Appeals found a protectable interest in customer relationships due to the employees' development of those relationships by virtue of their employment.  As Defendant concedes, however, "[n]either case involved preexisting customer relationships that the employee brought to their employer."  (ECF No. 37 at PageID 190.)  To the extent that Defendant contends these cases indicate that an employer only has a protectable interest in customer relationships formed by its employees during their employment, the Court disagrees.  While it may be sufficient that an employee established the customer relationship while working for the employer, the Court declines to extend that reasoning to find that such a scenario is necessary before an employer may establish a protectable interest in a customer relationship.  The Court is especially hesitant to do so when, as here, the employee sold its customer goodwill to the employer before joining as an employee.  Accordingly, the Court finds these cases minimally instructive within the distinct case at bar.

During the preliminary injunction hearing, Plaintiff raised the second consideration—the employee's access to trade secrets, business secrets, or confidential information—as an additional basis for a protectable interest.  At the request of Defendant, parties submitted supplemental briefs addressing the extent to which Plaintiff can establish such an interest based on this consideration with business-related information that does not constitute trade secrets.

10

Defendant maintains that "Tennessee formally abolished any legal protections for business-related information that are not trade secrets with adoption of the Uniform Trade Secrets Act ('UTSA') in 2000." (ECF No. 40 at PageID 221.)  Believing Plaintiff has not shown that Defendant had access to trade secrets, Defendant argues that Plaintiff therefore cannot establish a protectable interest based on business-related information.  (ECF No. 40 at PageID 222.)

Plaintiff notes that Defendant has not brought a claim against it under the UTSA and that, even if it did, that Act "does not pre-empt contractual remedies." (ECF No. 42 at PageID 418.) For additional support, Plaintiff points to several recent cases in which Tennessee courts have considered an employee's access to confidential information as one factor giving rise to a protectable business interest justifying enforcement of a covenant not to compete.

The definition of "trade secrets" under Tennessee law is not always helpful to the task of distinguishing "trade secrets" from mere "confidential information." *See, e.g., HCTec Partners, LLC, v. Crawford*, 2022 WL 554288, at *10 (Tenn. Ct. App. Feb. 24, 2022) ("Although what amounts to a trade secret is not altogether clear, a trade secret may 'consist[] of any formula, process, pattern, device, or compilation of information that is used in one's business to gain an advantage over competitors who do not use it.'") (internal citation omitted) (quoting *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *4 (Tenn. Ct. App. Aug. 25, 2015)).  Further, and as demonstrated in Parties' briefs, case law addressing this issue is similarly unclear. *See, e.g.*, *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F.Supp.2d 1029, 1031 (M.D. Tenn. 1998) ("[C]onfidential business information is only protectible to the extent that it qualifies as a trade secret"). *But see HCTec Partners, LLC*, 2022 WL 554288, at *5, *13 (finding that an employee's "unique, specialized training and his access to [employer's]

11

confidential information give[] rise to a legitimate business interest properly protectable by the [non-compete agreement]" and that there was "no genuine issue of material fact whether [employer] gave [employee] access to its trade or business secrets or other confidential information sufficient to contribute to a legitimate business interest protectable by an enforceable non-competition agreement"); *Vantage Tech.*, 17 S.W.3d at 645 ("An employer has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer").

Nonetheless, the Court finds that Plaintiff has "more than a mere possibility of success" in establishing a legitimate business interest in Defendant's "access to trade or business secrets or other confidential information" protectible by a covenant not to compete. *Vantage Tech.*, 17 S.W.3d at 644. Trade secrets are necessarily made up of confidential information, and Plaintiffs have cited several examples of information it deems confidential that could fit into the definition of "trade secrets" and to which Defendant had access.[5] The Court shares Defendant's concern that not all of the information Plaintiff has labeled "confidential" for purposes of establishing a protectable business interest may rise to the requisite level of confidentiality. *See Vantage Tech.*, 17 S.W.3d at 645 (citing *Amarr Co., Inc. v. Depew*, No. 03A01-9511-CH-00412, 1996 WL 600330, at *4–5 (Tenn. Ct. App. Oct. 16, 1996)) (acknowledging that "customer lists, customer credit information, pricing information, and profit and loss statements did not constitute confidential information because such information is easily available from sources other than the employer"). Given the evidence at this stage, however, including the testimony of Plaintiff's

---

[5] Plaintiff states that it has confidential information in its "internal pricing considerations, the identity of its customers, customer volumes, customer revenues, when customers' contracts are up for renewal, [Plaintiff's] technology platform and contemplated changes to that platform, its contemplated acquisition targets, and its expenses, revenues, and budgets." (ECF No. 42 at PageID 418.)

Chief Operating Officer that the type of information to which Defendant had access would be damaging if in the hands of a competitor (ECF No. 41 at PageID 356), the Court finds that Plaintiff is likely to succeed in establishing a protectable business interest in certain confidential information to which Defendant had access during his more than five years with Plaintiff.

Further, Plaintiff's argument is well taken that Defendant affirmed his understanding that he was being given access to confidential information when he signed the 2017 Non-Compete, the 2019 Termination Agreement, the 2021 Non-Compete, and the 2022 Separation Agreement. (*See* ECF No. 42 at PageID 419.)  Together, these factors indicate that Plaintiff has, at the least, "rais[ed] questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp.*, 119 F.3d at 402.

The Court also considers Plaintiff likely to succeed in showing that the time and territorial limits of the non-compete are not greater than necessary.  The 2021 Non-Compete is reasonable in its two-year duration.  While its nationwide application is broad, this breadth appears reasonable due to the fact that Plaintiff does business nationwide and Defendant engaged with Plaintiff's clients nationwide.  (ECF No. 35-1 at PageID 177.)  Courts have upheld similar time and territorial limits in covenants not to compete. *See, e.g., Combs v. Brick Acquisition Co.*, No. E2012-02696-COA-R3-CV, 2013 WL 5872448, at *9 (Tenn. Ct. App. Oct. 30, 2013) (holding a two-year noncompete reasonable under Tennessee law); *Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *5 (M.D. Tenn. Feb. 10, 2022) (upholding a two-year non-compete with nationwide applicability as reasonable).

### 2.     Reasonability Factors

The Court's inquiry does not end upon a finding that Plaintiff possesses a protectable business interest sufficient to justify enforcement of the 2021 Non-Compete. Once such an interest has been established, courts then look to four factors to decide whether the covenant not to compete is reasonable under the particular circumstances: "(1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest." *Murfreesboro Med. Clinic*, 166 S.W.3d at 678 (citing *Hasty*, 671 S.W.2d at 472–73). In this inquiry, "[t]here is no inflexible formula for deciding the ubiquitous question of reasonableness, insofar as noncompetitive covenants are concerned. Each case must stand or fall on its own facts." *Allright Auto Parks, Inc.,* 409 S.W.2d at 363. The Court addresses each of these factors in turn.

#### a.     Consideration

The 2021 Non-Compete must have been supported by adequate consideration to be enforceable. Plaintiff argues that it was, citing cases in which Tennessee courts found continued employment of an at-will employee to constitute adequate consideration for a covenant not to compete. (ECF No. 35-1 at PageID 178.) S*ee, e.g., Combs*, 2013 WL 5872448, at \*9 (holding a two-year noncompete reasonable and finding that "it is now well established in this state that continuing employment of an at-will employee can be adequate consideration for a covenant not to compete).

The Court agrees with Plaintiff that Defendant's continued employment at Plaintiff constituted valid consideration for the 2021 Non-Compete. First, that agreement explicitly states that Defendant was employed by Plaintiff "at will," meaning he could leave Plaintiff or be

14

terminated by Plaintiff at any time.  (ECF No. 1-6 at PageID 50.)  As such, Defendant was not entitled to continued employment, but was receiving it under the 2021 Non-Compete in exchange for his execution of the agreement.  *See Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 336 (Tenn. Ct. App. 2009) (finding that a non-compete "was clearly supported by adequate consideration [because] [a]s an at-will employee, [the employee's] continued employment by [the employer] was consideration for his execution of the [non-compete agreement].")  Further, courts in Tennessee have rejected the view that a non-compete lacks consideration when an employee is already employed at the time they are asked to sign it.  *See Hamilton-Ryker Group, LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *11, n.10 (Tenn. Ct. App. Jan. 28, 2010). For these reasons, the Court finds no reason to doubt that the 2021 Non-Compete, which was reaffirmed in the 2022 Separation Agreement, was supported by adequate consideration.

### b. Threatened Danger to the Employer

As discussed in the TRO, Plaintiff alleges that, if the Court does not grant injunctive relief, Defendant will solicit Plaintiff's clients, thus endangering Plaintiff's relationships with its clients and reducing its revenue.  (ECF No. 27 at PageID 132.)  The Court finds that this factor weighs in favor of granting the preliminary injunction.

Defendant acknowledges that he "began pursuing Infirmary Health and other former NEXT Medical Records clients" in June 2022—about a month after he left Plaintiff—and "is seeking to do business with" some other former NEXT Medical clients.  (ECF No. 16 at PageID 82 and 87.)  Given that stated intention, the Court finds that in the absence of a preliminary injunction, Defendant would likely continue to seek out Plaintiff's clients for his own, which could foreseeably result in damage to the goodwill Plaintiff has established with its clients who were formerly those of NEXT Medical.  Such a reduction in client goodwill is sufficient to establish the

requisite danger Plaintiff faces without a preliminary injunction. *See, e.g., Smith & Nephew, Inc.* 2012 WL 6607289, at *18 ("... regarding threatened danger to the employer in the absence of the noncompete agreement, Plaintiff would be in danger of losing the goodwill that it developed. . . .") *See also Vantage Tech.*, 17 S.W.3d at 647 ("If the covenant is not enforced, [employer] stands to lose . . . its investment in the development of customer relationships . . . ."). That Defendant has already shown success in his attempt to reclaim one of Plaintiff's customers—Infirmary Health—reinforces the Court's concern in this regard.

      **c.**      **<u>Economic Hardship Imposed on the Employee</u>**

The threatened danger to Plaintiff in absence of a preliminary injunction must be balanced against the economic hardship the 2021 Non-Compete imposes on Defendant. *Vantage Tech.*, 17 S.W.3d at 647. During the preliminary injunction hearing, parties appeared to narrow the disputed category of clients for purposes of this Order to former clients of NEXT Medical;[6] Plaintiff did not mount a strong claim to non-Plaintiff customers at this stage, and Defendant acknowledged that Plaintiff has a protectable interest in its clients Defendant met while employed by Plaintiff. (*See* ECF No. 41 at PageID 271, 269.)

Concerning this category of clients, the Court acknowledges that enforcing the 2021 Non-Compete against Defendant would result in some economic hardship to him insofar as he would still be barred from pursuing Infirmary Health, which had already agreed to employ his company's services before the TRO. Regarding former NEXT Medical clients other than Infirmary Health, the Court is not convinced that preventing Defendant from soliciting them imposes an economic hardship outweighing the threatened danger to the Plaintiff. Defendant's stated intention that he

---

[6] Defendants further narrowed this category in their Proposed Consent Preliminary Injunction (ECF No. 43), filed September 19, 2022. Plaintiff, however, filed a Notice of Opposition to Defendants' Proposed Consent Preliminary Injunction (ECF No. 44) the same day.

would like to pursue those clients indicates that he does not already have them. Consequently, whether Defendant pursued and reclaimed all 23 of those clients, or only 1, the result would be Defendant gaining that to which he is not currently entitled. Meanwhile, Plaintiff would lose clients in such a scenario. Accordingly, the Court finds that the economic hardship posed on Defendant by enforcing the 2021 Non-Compete does not outweigh the danger Defendant poses to Plaintiff absent a preliminary injunction.

### d. Public Interest

Plaintiff argues that granting the preliminary injunction to enforce the 2021 Non-Compete would be in the public interest because "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." (ECF No. 35-1 at PageID 180 (citing *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013).) The 2021 Non-Compete does not appear to be inimical to the public interest. The Court agrees with Plaintiff that this factor weighs in favor of granting the preliminary injunction, especially given the Court's finding that Plaintiff is likely to succeed on the merits of its breach of contract claim.

## B. Threat of Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiff must also establish the second preliminary injunction factor—that the threat of irreparable harm exists absent injunctive relief. *Tenke*, 511 F.3d at 550. As a threshold requirement for injunctive relief, the movant must demonstrate irreparable harm because, if the threat of irreparable harm does not exist, "there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019). The district court must make "specific findings of irreparable injury to the party seeking the injunction." *Friendship Materials, Inc.*, 679 F.2d at 105. The threat of irreparable harm must also be "likely" as opposed to merely possible. *See Lieberman*

*v. Husted*, 900 F. Supp. 2d 767, 781 (S.D. Ohio 2012). In other words, allegations of "speculative or theoretical" irreparable harm will not warrant injunctive relief. *Id.* "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Nevertheless, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to show irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Here, Plaintiff has alleged irreparable harm in the loss of its customer goodwill that goes beyond mere speculation. (ECF No. 27 at PageID 134.) Defendant has been forthright in his intentions to pursue Plaintiff's clients who were formerly those of NEXT Medical. Taking him at his word, then, the Court finds that it is not merely possible, but "likely" that Plaintiff would suffer irreparable harm absent injunctive relief as a result of Defendant's pursuit of its clients. Defendant's declaration prior to the TRO that MRME would begin providing Infirmary Health ROI services on August 1, 2022 absent a TRO indicates his willingness and ability to harm Plaintiff's investment in its client goodwill and service those clients even pending this litigation. (*See* ECF No. 23-1 at PageID 124.) Such losses are sufficient to constitute irreparable harm. *See Basicomputer Corp.*, 973 F.3d at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute"); *see also Tenke*, 511 F.3d 535 at 550. As the Court is not aware of a way it could quantify Plaintiff's loss of customer goodwill, and because the record does not otherwise indicate that there are adequate

18

remedies at law, the Court finds that Plaintiff has satisfied its burden of showing irreparable harm absent a preliminary injunction. *See U.S. v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.")

### C.     Harm to Others and Public Interest

Turning to the third and fourth factors—whether the issuance of the injunction would cause substantial harm to others, and whether the public's interest would be furthered by the grant of an injunction—the Court finds that these factors no longer weigh as heavily at this stage as they did during the Court's consideration of Plaintiff's request for a TRO.  At that stage, this Court expressed concern that should it not grant the TRO, and thus allow Infirmary Health to use MRME's services, Infirmary Health might abruptly lose ROI services if the Court ultimately granted Plaintiff's preliminary injunction.  Such a result could harm Infirmary Health by leaving it without the ability to meet its compliance obligations under federal law. *See* 20 C.F.R. § 401.55(b)(1)(i).  Correspondingly, stripping Infirmary Health of ROI services could also harm the public interest, since healthcare professionals could be deprived of access to information needed to treat their patients.  Accordingly, the Court found that these risks weighed in favor of granting the TRO in order to preserve the status quo.  (ECF No. 27 at PageID 135–36.)

The possibility remains that Infirmary Health could lose access to ROI services should it be permitted to contract with MRME and should MRME then lose its ability to provide those services as a result of this litigation.  As Plaintiff explained following the TRO, however, Infirmary Health has extended its relationship with Plaintiff until September 30, 2022.  (*See* ECF No. 29.) Given that relationship, and considering Infirmary Health's familiarity with this litigation at this

point, the Court believes Infirmary Health is fully capable of taking the aforementioned risks into consideration in making future decisions about who it wants to provide ROI services.

The Court also notes that "Tennessee law requires enforcement of a reasonable agreement not to compete" and, having found that the 2021 Non-Compete is likely reasonable, thus "finds that issuing a preliminary injunction would not be contrary to public policy," but in service of the public interest. *Am. Home Shield Corp. v. Ozur*, 2016 WL 8738243, at *5 (W.D. Tenn. Sept. 13, 2016).

## CONCLUSION

For the foregoing reasons, and having fully considered the applicable discretionary factors and governing law as appropriate under Fed. R. Civ. P. 65, the Court hereby **GRANTS** the requested preliminary injunction with bond set at $100,000.00. All specific findings above are preliminary and exclusively for purposes of this Order. The specific terms, as required under Fed. R. Civ. P. 65(d)(1)(B), are as follows: Defendant Carlos Rodriguez, including to the extent applicable his sole proprietorship MRME, LLC and its agents, are hereby **ENJOINED** against providing health information management ("HIM") services, including ROI services, to any past or present client of Plaintiff, including Infirmary Health, throughout the pendency of this litigation. Plaintiff's Motion is **GRANTED**. (ECF No. 35.)

**IT IS SO ORDERED**, this 28th day of September, 2022.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE